IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN DOYLE, | ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) | No. 12 C 7131 |
| THE VILLAGE OF WILMETTE and SERGEANT THOMAS DWORAK, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Brian Doyle has sued the Village of Wilmette, Illinois and Wilmette police Sergeant Thomas Dworak under 42 U.S.C. § 1983. Doyle alleges that Dworak violated the Fourth Amendment by arresting Doyle without probable cause in October 2011 (Count 1), unreasonably seizing his property in conjunction with his arrest (Count 3), and unreasonably detaining him after the arrest (Count 4). Finally, Doyle alleges a claim of false imprisonment under Illinois law, also naming the Village as a defendant based on respondeat superior (Count 6). Doyle previously asserted a section 1983 excessive force claim (Count 2) and a parallel state law assault claim (Count 5), but he dropped those claims in May 2013.

Defendants have moved for summary judgment on Doyle's remaining claims. For the following reasons, the Court grants defendants' motion.

**Background**

Doyle is a Chicago police officer. On the afternoon of October 9, 2011, he joined

a group of five other men in Wilmette Harbor aboard a thirty-foot twin-engine boat to celebrate the birthday of its owner, Cameron Adams. The boat left Wilmette Harbor and traveled some distance—how far is disputed by the parties—northwest into Lake Michigan, where the men fished.

Onboard the boat along with the men were four firearms, including Doyle's Lewis Machine & Tool .223 caliber rifle—which is considered an AR-15 semi-automatic assault rifle—as well as Doyle's service weapon, a Glock nine-millimeter handgun. Doyle had brought about ninety rounds of ammunition for his two guns, and Adams, the boat's owner, had several more rounds in an ammunition bag. Around 4:15 p.m. that day, the men began firing the guns from the boat, aiming at a five-gallon bucket that served as a target. The shooting lasted between forty-five minutes and an hour; as a group, the men fired hundreds of rounds.

After this shooting session, the men traveled around the waters outside Chicago, eventually returning north in the direction of Wilmette Harbor. At some point that evening, once it was dark, they stopped the boat and again began firing the weapons that were on board. Though the parties dispute how far off shore the boat was when this new round of shooting occurred, the reports from the weapons drew some attention in Wilmette. Around 9 p.m., Wilmette police officer Nicholas Rizzo was locking the gates in Gillson Park on the Wilmette waterfront when he heard shots fired on the lake. After Rizzo drove to the park's rock pier to investigate where the noises were coming from, several individuals on the park's dog beach who had also heard the noises asked him if they were gunshots.

Sergeant Dworak heard Rizzo's radio report about the shots. Dworak then met

Rizzo in Gillson Park, where Rizzo repeated his observations about the shots, adding that he did not know how far from his location the shots occurred. At some point thereafter, Rizzo and Dworak observed Adams's boat travel into view and pull alongside a sailboat outside Wilmette Harbor. Rizzo told Dworak that he thought the shots had come from Adams's boat, as it had come from the same direction as the sound of the shots. Dworak then went to the nearby Coast Guard station, where Executive Petty Officer Christopher Price told Dworak that a Coast Guard auxiliary boat had also reported gunfire on the lake. At no point in time did anyone actually see someone shooting a gun on Adams's boat.

The Coast Guard then sent a vessel to Adams's boat, while Dworak waited at the Coast Guard station. There, a mechanic, labeled an "unknown seaman" in Dworak's police report, told Dworak that one individual aboard the boat was an off-duty police officer who had fired a weapon into the lake. Defs.' Ex. G at 7. Once Price returned to the station, he told Dworak where Doyle and Adams had docked their boat and that the Coast Guard had required a sober driver to pilot the boat back to shore because the boat's inhabitants were intoxicated. Price also told Dworak that the Coast Guard had not secured weapons that were aboard Adams's boat.

Soon thereafter, Dworak approached Adams's boat with Rizzo and another Wilmette police officer, Larry Betz. The parties dispute whether Doyle told Dworak that he had been shooting firearms on the lake. They agree, however, that Dworak asked Doyle where his gun was and that Doyle told him it was in a glove compartment on the boat. Then, as Dworak testified in his deposition, Dworak proceeded to walk along the pier next to the boat, and in "the open area of the back end of the boat, [he] observed

3

numerous pistol shells, rifle shells, and shotgun—expended shotgun shells." Pl.'s Ex. A at 43–44. Dworak then ordered Betz and Rizzo to arrest Doyle and Adams.

After the arrest, Dworak went onto Adams's boat to find Doyle's service weapon; once there, he also found a shotgun, two AR-15 rifles, and hundreds of rounds of ammunition. Dworak asked an evidence technician from his department to catalog and collect the guns and ammunition from the boat and waited until the technician arrived. After speaking to a Coast Guard seaman who had been part of the boarding party at Adams's boat, Dworak went to the Wilmette police station, where he spoke with Commander Marty Paulson about the incident. The two officers discussed what charges potentially could be filed against Adams and Doyle. Paulson asked Dworak to telephone the Cook County Sheriff's Department. During the call, Dworak explained the incident to a sergeant from that department. Some minutes later, the sergeant called back and told Dworak that his department would not seek charges against Adams or Doyle. Exactly when these two phone calls occurred is unclear from the record. Dworak testified during his deposition that at some point between 12:30 and 1:00 a.m., Commander Paulson told him to call the Sheriff's Department; in his original report on the matter, however, he said the call took place at 11:30 p.m.

Dworak informed Paulson that the Sheriff would not charge Doyle or Adams, and Paulson told Dworak to release both men. Dworak went to tell the men they were to be released and that no charges were filed against them; he also told Doyle to contact his own commander about the incident. Doyle was not able to retrieve his weapons that night. Before Doyle's release, Sergeant Dworak told Doyle that he could have them back only if he could "blow zeros" on a Breathalyzer, but Doyle refused to take the test.

4

Defs.' Ex. D at 137–38. Doyle was released about 1:45 a.m. that night, without his guns. He picked up his rifle on October 10, but not his service weapon, because the Chicago Police Department had asked the Wilmette Police Department to keep it in light of an internal investigation of the incident.

## Discussion

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court must "construe the facts and draw all reasonable inferences in favor of the nonmoving party." *Ferraro v. Hewlett-Packard Co.*, 721 F.3d 842, 847 (7th Cir. 2013). "A genuine issue of material fact exists only where there is enough evidence that a reasonable jury could return a verdict in favor of the nonmoving party." *Collins v. Am. Red Cross*, 715 F.3d 994, 997 (7th Cir. 2013).

Dworak and the Village have moved for summary judgment on all four of Doyle's remaining claims. Their primary contention on the false arrest, unreasonable seizure of property, and false imprisonment claims is that Dworak had probable cause to arrest Doyle and seize the weapons. As for Doyle's unreasonable detention claim, the defendants contend that any delay in releasing Doyle was not deliberate and was reasonable under the circumstances.

### 1. False arrest claim

Doyle contends there was no probable cause for his arrest. Probable cause to arrest exists "if the totality of the circumstances known to the officer at the time of the arrest would warrant a reasonable person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Gutierrez v. Kermon*, 722 F.3d 1003,

5

1008 (7th Cir. 2013). This "requires only that a probability or substantial chance of criminal activity exists; it does not require the existence of criminal activity to be more likely true than not true." *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056–57 (7th Cir. 2011). Further, "the offense for which probable cause exists need not be the subjective offense for which the officer was conducting the arrest." *Ramos v. City of Chicago*, 716 F.3d 1013, 1018 (7th Cir. 2013).

In framing this matter, Doyle says that the defendants base their probable cause argument primarily on his disputed pre-arrest admission to Dworak that he had been firing guns on the lake. Doyle contends that "[t]he only other facts" Dworak knew before the arrest related to reports of gunfire on Lake Michigan and the Coast Guard's report "that there were three individuals on the boat." Pl.'s Mem. at 7. He argues that this did not add up to probable cause.

Doyle's argument overlooks several additional matters that are undisputed. To begin with, Dworak first learned of the gunfire on the lake from officer Rizzo. Rizzo heard the shots and told Dworak he thought the shooting had come from Adams's boat, because he watched it move from the direction of the noise that came from the shots. Dworak received another account of the gunfire from the Coast Guard station at the park, where he learned that a Coast Guard auxiliary boat had reported shots fired while patrolling the lake. When the Coast Guard brought in Adams's boat, an officer told Dworak that the Coast Guard had to locate a sober driver to bring Adams's boat back to shore and that there were weapons on board that were not secured. While waiting for the boat to come in, Dworak was told by an unnamed Coast Guard mechanic that an off-duty police officer on the boat had been firing guns on Lake Michigan. (Doyle

6

questions how the mechanic could have learned this information, but he does not dispute that Dworak heard it from the mechanic.) Finally, Doyle concedes that before Dworak ordered his arrest, Dworak looked onto the boat's deck and saw "numerous spent pistol casings, rifle casings and shotgun shells." Pl.'s Resp. to Defs.' LR 56.1 Stat. ¶ 33.

Defendants identify several crimes for which they contend Dworak had probable cause to arrest Doyle. These include Illinois laws against reckless conduct, disorderly conduct, and firing a weapon on Illinois waters, and Wilmette ordinances against breaching the peace and discharging firearms within Village limits. Doyle argues that a reasonable jury could find probable cause lacking for each of these offenses.

The Illinois statute that prohibits firing weapons on state waters states that "[i]t is unlawful to fire a rifle, pistol, revolver or airgun on, over or into any waters of this State, including frozen waters." 520 ILCS 5/2.33(q). Doyle argues that this law does not prohibit firing a shotgun and that Dworak had no way of knowing whether anyone on the boat had fired something other than a shotgun. He further contends that Dworak had no information that anyone had actually seen someone (let alone Doyle specifically) fire a weapon from the boat.

The totality of Dworak's undisputed knowledge would prevent a reasonable jury from finding that probable cause to arrest Doyle for this offense was lacking. Doyle's shotgun argument is undercut by the undisputed fact that Dworak saw spent shells from multiple types of firearms on the boat's deck, including from pistols and rifles, which are enumerated in the Illinois statute. Furthermore, it is undisputed that Dworak had information from several sources that collectively reflected both that people had been

7

firing weapons from this particular boat and that Doyle himself had done so. This was enough for a reasonable officer to conclude that there was a "probability or substantial chance" that Doyle had violated section 2.33(q). *Mucha*, 650 F.3d at 1056. No reasonable jury could find otherwise based on the undisputed facts of record.

The Court notes that each side has argued that the Court should strike a particular statement by the opposing side concerning the issue of probable cause. These statements include Doyle's alleged admission to Dworak that he had fired a weapon on the lake and whether Dworak heard a Coast Guard radio transmission to the same effect. The Court need not decide whether these statements should be stricken. Even if one sets these matters aside, the undisputed facts known to Dworak at the time of Doyle's arrest would prevent a reasonable jury from finding the absence of probable cause. Defendants are entitled to summary judgment on Count 1.

**2.    Unreasonable seizure of property claim**

Doyle also contends that "because seizure of plaintiff's guns was without probable cause Plaintiff's Fourth Amendment rights were violated although the guns were eventually returned to plaintiff." Pl.'s Mem. at 11. He adds a search-incident-to-arrest argument, alleging that Dworak's boarding of the boat and finding weapons there "was improper because police are only authorized to search a vehicle incident to arrest when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Id.* (citing *Arizona v. Gant*, 556 U.S. 332, 343 (2009)).

As noted above, no reasonable jury could find that Dworak lacked probable cause to arrest Doyle. And in relying on *Gant*, Doyle overlooks the fact that the

8

Supreme Court held "that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Gant*, 556 U.S. at 343 (internal quotation marks omitted). No reasonable jury could find the absence of a reasonable basis to believe that evidence relevant to the shooting-related crimes might be found on the boat. It is patently obvious that such evidence, including firearms, shells, or shell casings, might be found there. And it is undisputed that, before arresting Doyle, Dworak actually saw spent shell casings on the boat's deck and that Doyle told Dworak that his gun was on the boat. Defendants are entitled to summary judgment on Count 3.

**3.  Unreasonable detention claim**

Doyle contends that the length of his detention at the Wilmette police station was unreasonable, specifically "the last two hours," which "were a form of punishment imposed via needless delay for delay's sake." Pl.'s Mem. at 12. Doyle argues that although he was detained for a total of about three and a half hours, from 10:30 p.m. to 1:45 a.m., Dworak knew that "no charges were going to be approved against plaintiff" two hours before his actual release. *Id.*

"Needless delay, or delay for delay's sake—or, worse, delay deliberately created so that the process becomes the punishment—violates the fourth amendment." *See Portis v. City of Chicago*, 613 F.3d 702, 705 (7th Cir. 2010). In making a claim to redress such a wrong, "the plaintiff bears the burdens of proof and persuasion on the contention that any particular detention was excessive, and the court must examine not only the length of a given detention but also the reasons why release was deferred." *Id.* Unlike individuals stopped on reasonable suspicion or at checkpoints, arrestees "need

9

*not* be released as quickly as possible." *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002). Detention periods between three and fourteen and a half hours have been deemed "not constitutionally unreasonable absent any evidence that the delay in releasing the arrested individuals was motivated by an improper purpose." *Ray v. City of Chicago*, 629 F.3d 660, 663–64 (7th Cir. 2011).

As support for his claim, Doyle relies upon Dworak's original case report concerning the evening of October 11. There, Dworak noted that he called the Cook County Sheriff's Police Department "[a]t approximately 11:30 PM" to determine whether Cook County would pursue charges against Doyle. Defs.' Ex. G at 7. The report says that Cook County informed Dworak around 11:40 p.m. that it would not pursue charges. Doyle argues that "the evidence establishes that there was no reason not to immediately release plaintiff once charges had been refused, and the defendants have offered no explanation for this delay." Pl.'s Mem. at 12. The defendants counter that Dworak's original police report notes only that Cook County made its determination around 11:40 p.m. and that the Wilmette Police Department was still debating the matter of its own charges until 12:30 or 1:00 a.m., as noted in Dworak's deposition testimony. Dworak testified that at "probably 1:00 o'clock in the morning," or "maybe 12:30," his supervisor, Paulson, "was seeking some further guidance in terms of what we should do." Pl.'s Ex. A at 62. Defendants argue that this explains at least some of the gap between the 11:40 p.m. call from Cook County and Doyle's 1:45 a.m. release.

Though Doyle does not address Dworak's testimony about the 12:30–1:00 a.m. discussions, the issue is not as clear-cut as the defendants contend. Dworak's deposition testimony indicates that his supervisor was still pondering charges against

10

Doyle at 12:30 or 1:00 a.m. But Dworak also testified that it was *after* that time that Paulson told him to call Cook County. Dworak's police report, however, states that his phone exchange with Cook County concluded by 11:40 or so. The defendants have therefore offered one piece of evidence indicating that Wilmette officers had heard Cook County's answer by 11:40 p.m. and another implying that they did not hear from the County until after 12:30 or 1:00 a.m. For present purposes, the Court must view the evidence in the light most favorable to Doyle, which in this instance means the Court must assume that the Wilmette Police Department had its answer on whether the County would bring charges sometime shortly after 11:40 p.m. That leaves a gap of approximately two hours before Doyle's release.

Even so, Doyle does not offer evidence that would permit a reasonable jury to find that he was detained unreasonably. Specifically, he has offered no "evidence of improper purpose for the delay," *Chortek v. City of Milwaukee*, 356 F.3d 740, 747 (7th Cir. 2004), or "delay for delay's sake," *Portis*, 613 F.3d at 705. Defendants contend that they were still determining the viability of local charges against him during the period in question, even if Cook County had decided not to pursue charges. Defendants' articulation of this rationale is not crystal clear, but Doyle has not addressed it. That aside, the sole case that Doyle cites invalidated a judge's imposition of a two-hour cap on the length of detention, while observing that the record in the case did "not establish deliberate delay." See *id.* at 706. Similarly, there is no evidence here from which a reasonable jury could find deliberate delay.

A four-hour delay has been found potentially unreasonable, but in that case, the court pointed to evidence that police held the arrestee "out of spite." *Gramenos v.*

11

*Jewel Cos.*, 797 F.2d 432, 436 (7th Cir. 1986). And in *Ray*, though it was undisputed that the plaintiff was detained for "several hours" following a traffic stop, her claim could not proceed because she could not show that detention "was the result of illicit motives." *Ray*, 629 F.3d at 664. The evidence that Doyle presents here likewise would not permit a reasonable jury to find that his detention between 11:40 p.m. and 1:45 a.m. was arbitrary or the result of illicit motives, or that it was "deliberately created so that the process becomes the punishment." *Portis*, 613 F.3d at 705.

In addition, it is undisputed that at least some relevant events occurred during the two hours before Doyle's actual release. These included an exchange Doyle had with Dworak over the release of Doyle's weapons, Doyle's refusal to take a Breathalyzer test to get his guns back, and Dworak's discussion with Doyle about contacting his commander about the incident. Neither party provides a time or duration for these interactions, but Doyle does not contend that they occurred before the two-hour window of supposedly dead air that he alleges in support of his unreasonable detention claim. This evidence undercuts any contention that the Wilmette police unreasonably continued to hold Doyle arbitrarily or for any sort of improper purpose.

In sum, a reasonable jury would have no evidence upon which to base a finding that Dworak kept Doyle in detention needlessly, out of spite, or "for delay's sake." For these reasons, defendants are entitled to summary judgment on Count 4.

**4. False imprisonment claim**

Doyle stakes his common-law false imprisonment claim on the validity of his arrest. He does not argue the elements of the claim in his brief, explaining only that "there was not reasonable grounds [sic] to believe that plaintiff had committed a crime."

12

Pl.'s Mem. at 14–15. To the extent that Doyle bases his false imprisonment claim on the lack of probable cause for his arrest, the Court has already rejected that contention. To the extent that he bases it on the length of his detention at the Wilmette police station after his arrest, the Court has likewise rejected his contention. In either case, no reasonable jury could find in Doyle's favor. Thus the Court need not address the parties' arguments concerning the Illinois Tort Immunity Act. Defendants are entitled to summary judgment on Count 6.

## Conclusion

For the foregoing reasons, the Court grants defendants' motion for summary judgment [docket no. 27] and directs the Clerk to enter judgment in favor of the defendants.

							_____
							MATTHEW F. KENNELLY
							United States District Judge

Date: September 19, 2013